PEOPLE v BOUCHEE

Docket No. 57233. Argued May 6, 1976 (Calendar No. 11).—Decided June 2, 1977.

Willie L. Bouchee was convicted by a jury in Kalamazoo Circuit Court, Raymond W. Fox, J., of assault with intent to rape. The Court of Appeals, R. B. Burns, P. J., and Bashara and M. J. Kelley, JJ., affirmed (Docket No. 20946). Defendant raises three issues on appeal: during the trial the court and the prosecutor asked the defendant and a witness testifying on his behalf questions concerning his moral and religious beliefs; defendant and his wife were questioned about the legitimacy of their children; and the prosecuting attorney during his argument to the jury commented upon his opinion of the credibility of the witnesses and the guilt of the defendant. Defendant appeals. *Held:*

1. A question by the trial court which was apparently designed to elicit an admission from the defendant that his claimed belief in the Bible was at odds with his testimony that he was willing to have consensual extramarital sexual relations with the complainant constituted an inquiry of the defendant forbidden by statute as concerning his "opinions on religion". Even if the defendant's testimony concerning his religious belief is assumed to be relevant to show that his good character rebuts the charge, the evidence did not invite or justify the kind of "clarifying inquiry" made by the court. The statute expressly forbids questions to the defendant concerning the nature, substance, and content of his religious beliefs.

2. Although the statutory prohibition only precludes questioning a witness concerning his own religious beliefs, questioning a witness to explore another's religious opinions and beliefs is equally offensive to the statutory principle. Testimony by a witness, a minister in the defendant's church, that the defendant was a "good man" in explaining the basis of his testimony

References for Points in Headnotes
[1–8, 10, 12] 81 Am Jur 2d, Witnesses §§ 524, 526, 563.
[2, 3, 6, 8–10, 12] 81 Am Jur 2d, Witnesses §§ 471 *et seq.* 533.
[10, 12] 81 Am Jur 2d, Witnesses §§ 592, 593.
[11] 5 Am Jur 2d, Appeal and Error § 545 *et seq.*

of the defendant's reputation for veracity did not justify a general inquiry on cross-examination concerning the defendant's entire character or any inquiry concerning the defendant's religious beliefs and practices.

3. The use of religious beliefs is prohibited by statute even for impeachment, and it is the intention of the Legislature that the proscription apply to intrinsic and extrinsic impeachment alike. The inquiries concerning the defendant's religious beliefs were prejudicially unfair and constitute grounds for reversal.

4. The extent to which a witness may be cross-examined on questions affecting his credibility rests in the sound discretion of the court. The previous life and character of a witness may be inquired into to elicit facts which may aid the jury in determining what credence they will attach to his testimony; however, it is the trial court's duty to keep such character examination within reasonable bounds. The character evidence offered to impeach or support a witness's credibility, other than evidence of prior conviction for crime, must be limited to the particular character trait of truthfulness.

5. Evidence concerning the legitimacy of the defendant's children was inadmissible because it was not competent to impeach his testimony or his wife's by showing them to be possessed of a general bad character. The legitimacy of their children is not related to the truthfulness of the parents as witnesses, and the testimony was unfairly prejudicial; therefore admission of the testimony amounted to an abuse of discretion.

6. The contention that the prosecutor's argument to the jury improperly expressed his personal opinion as to the credibility of a witness and the defendant's guilt is not persuasive. In any event, because no objection was made at trial, appellate review is foreclosed unless failure to consider the issue would result in a miscarriage of justice.

Justice Coleman, joined by Justice Fitzgerald, concurred in the result because it was error to permit the prosecutor to cross-examine the defendant over objection concerning the legitimacy of the defendant's children. This was prejudicial information which had, at most, a remote relationship to the charge and to defendant's credibility.

Reversed and remanded for a new trial.

62 Mich App 132; 233 NW2d 503 (1975) reversed.

OPINION OF THE COURT

1. CRIMINAL LAW—WITNESSES—RELIGIOUS BELIEF.

A question by the court in a trial for assault with intent to rape

which was apparently designed to elicit an admission from the defendant that his claimed belief in the Bible was at odds with his testimony that he was willing to have consensual extramarital sexual relations with the complainant constituted an inquiry of the defendant forbidden by statute as concerning his "opinions on religion" (MCL 600.1436; MSA 27A.1436).

2. CRIMINAL LAW—WITNESSES—RELIGIOUS BELIEF—EVIDENCE—RELEVANCE.

Assuming its relevance, evidence of a defendant's religious beliefs as tending to show his good character to rebut a charge of assault with intent to rape does not invite or justify a "clarifying inquiry" by the trial court whether the defendant's religious beliefs permitted consensual extramarital sexual relations (MCL 600.1436; MSA 27A.1436).

3. CRIMINAL LAW—WITNESSES—RELIGIOUS BELIEF.

Inquiry of a defendant concerning the nature, substance, and content of his religious beliefs in order to show that the beliefs were inconsistent with the qualities of good character claimed by the defendant is expressly forbidden by statute and case law (MCL 600.1436; MSA 27A.1436).

4. CRIMINAL LAW—WITNESSES—RELIGIOUS BELIEF.

Questioning a witness to explore another witness's religious beliefs is offensive to the statutory prohibition which precludes questioning a witness concerning his own religious beliefs (MCL 600.1436; MSA 27A.1436).

5. CRIMINAL LAW—WITNESSES—RELIGIOUS BELIEF—IMPEACHMENT.

The intention of the Legislature to prohibit impeachment of a witness by the use of religious beliefs applies to intrinsic and extrinsic impeachment alike (MCL 600.1436; MSA 27A.1436).

6. CRIMINAL LAW—WITNESSES—RELIGIOUS BELIEF.

Inquiry by the trial court of the defendant in a trial for assault with intent to rape and inquiry by the prosecutor of a witness for the defense concerning the defendant's religious beliefs were prejudicially unfair and constitute grounds for reversal.

7. CRIMINAL LAW—WITNESSES—CREDIBILITY—IMPEACHMENT.

Any witness who testifies, including a defendant in a criminal case, puts in issue his credibility; the extent to which a witness may be cross-examined on questions affecting his credibility rests in the sound discretion of the trial court.

8. CRIMINAL LAW—WITNESSES—CREDIBILITY—IMPEACHMENT—EVI-
DENCE OF CHARACTER.

The previous life and character of a witness may be inquired into
to elicit facts which may aid the jury in determining what
credence they will attach to his testimony; however, it is the
trial court's duty to keep such character examination within
reasonable bounds.

9. CRIMINAL LAW—WITNESSES—CREDIBILITY—IMPEACHMENT—EVI-
DENCE OF CHARACTER.

Evidence of a witness's credibility, other than evidence of prior
conviction of a crime, must be limited to the particular charac-
ter trait of truthfulness.

10. CRIMINAL LAW—WITNESSES—CREDIBILITY—IMPEACHMENT—CHAR-
ACTER.

Evidence concerning the legitimacy of a defendant's children was
inadmissible because it was not competent to impeach his
testimony or his wife's by showing them to be possessed of a
general bad character: the legitimacy of the children is not
related to the truthfulness of the parents as witnesses.

11. CRIMINAL LAW—ARGUMENT OF COUNSEL—PROSECUTOR'S PERSONAL
OPINION—PRESERVING QUESTION.

Appellate review of a contention that a prosecutor's argument to
the jury improperly expressed his personal opinion as to the
credibility of a witness and the defendant's guilt is foreclosed
where no objection was made at trial unless failure to consider
the issue would result in a miscarriage of justice.

CONCURRING OPINION

COLEMAN and FITZGERALD, JJ.

12. CRIMINAL LAW—WITNESSES—CREDIBILITY—IMPEACHMENT.

*Permitting the prosecutor to cross-examine the defendant over
objection concerning the legitimacy of the defendant's children,
which was prejudicial information which had, at most, a re-
mote relationship to the charge of assault with intent to
commit rape and to defendant's credibility, was reversible
error.*

*Frank J. Kelley,* Attorney General, *Robert A.
Derengoski,* Solicitor General, *Donald A. Burge,*
Prosecuting Attorney, and *Stephen M. Wheeler,*
Chief of Appellate Division, for the people.

*Jerkins, Plaszczak, Silaski & Hurley* for defendant.

RYAN, J. Willie Lee Bouchee was convicted by a jury of assault with intent to commit rape.[1] The Court of Appeals affirmed the conviction.[2]

We granted leave to consider the defendant's claim that improper inquiry was made of him concerning his religious beliefs, that similar improper questions were asked of his character witness, that unfair inquiry was made concerning the legitimacy of his children, and that he was unfairly prejudiced by the prosecutor's argument to the jury.

We reverse and remand for a new trial.

I

At trial the complainant testified *inter alia* that the defendant lured her to a secluded area under the guise of a post-luncheon employment interview and then attempted to rape her.

The defendant testified to having lunch with the complainant but stated that, while returning from a restaurant, she suggested they drive to a remote spot and later agreed to have sexual relations with him for $100. Mr. Bouchee said that he balked at the price and stepped out of his car for a moment, whereupon the complainant drove away. There were no other witnesses to the transaction.

II

The defendant asserts that certain questions put to him by the trial court during the prosecutor's cross-examination, and certain questions asked of

[1] MCLA 750.85; MSA 28.280.

[2] 62 Mich App 132; 233 NW2d 503 (1975).

his witness, Reverend Amos Williams, constituted improper inquiry relating "to his opinions on religion" contrary to MCLA 600.1436; MSA 27A.1436 and our holding in *People v Hall,* 391 Mich 175; 215 NW2d 166 (1974).[3]

[3] The entire colloquy relevant to the issue is set forth below in order to illustrate the context in which the challenged questions were asked. The specific questions complained of are in italics.

*"Q. [Direct examination by defense counsel]:* Are you a member of any church?

*"A.* Yes, I am.

*"Q.* What is that?

*"A.* Well, I am a member of the Catholic church but I mostly attend church with my wife and kids. They is a member of the Church of God in Christ."

\* \* \*

*"Q. [Cross-examination by the prosecutor]:* So, you are coming up to this complete stranger and you are telling us you wanted to establish a relationship with this person. What type of relationship did you want to establish?

*"A.* A friendly relationship.

*"Q.* Why?

*"A.* Because—

*"Q.* Would you probably never see her again, would you?

*"A.* She had been so friendly with not only me but everyone in the laundromat. She had been so friendly and a lot of times I find people of that type that might be lonely some or whatnot so we do our best, at least I do my best. I believe strictly in the Bible.

*"Q.* That is not responsive to the question. I asked you what kind of relationship did you want to establish.

*"A.* I answered that. A friendly relationship, friendly."

\* \* \*

*"Q.* So, as a married man then apparently it would not—there would be no drawbacks because of your marital situation to having relations with some person that you took out and found to be friendly.

*"A.* No, I think you are confusing me with your question because you start a question one way and it is twisted around another way and I would like to give you—

*"The Prosecutor:* I would ask that the witness simply answer the question.

*"The Court:* Have the reporter read back the last question again, this last one. (Whereupon the court reporter read back the last question.)

*"The Court:* You may take it.

*"A.* No, the part of the question, the drawbacks, I don't follow the drawbacks. I am under oath to tell the truth and God knows it is my intention to do it and if you can give me an explanation on the drawbacks, I can answer it, but a drawback can mean several things."

\* \* \*

"*Q.* So, really there is no degree of faithfulness that attaches to marriage as far as you are concerned Mr. Bouchee?

"*A.* Oh, yes, quite a bit.

"*Q.* What? Obviously it is not sexual fidelity, sexual faithfulness, is it?

"*A.* Well, no, I wouldn't say that it is.

"*Q.* In fact, all of the children of your marriage were born before the marriage, isn't that true?

"*A.* Yes, sir.

"*Defense Counsel:* I am going to object to that, your Honor.

"*The Court:* That is obvious from the record here.

"*Defense Counsel:* But it is irrelevant here.

"*The Court:* No, you may take it.

"*The Prosecutor:* It certainly bears on this man's credibility.

"*The Court:* You may take it. I don't know as the birth of children before marriage bears on one's credibility but it is already apparent. The objection is sustained. *Well you spoke of the Bible, didn't you?*

"*The Witness:* Yes, sir.

"*The Court:* Accepting the Bible wouldn't stop you then from having relations though you were a married man with a single woman or married as far as that is concerned, is that right, that wouldn't stop you either?

"*The Witness:* No, I don't think so.

"*The Court:* If the occasion presented itself?

"*The Witness:* Well, no, I don't think it would.

"*The Court:* Okay."

During the cross-examination of Reverend Amos Williams, the defendant's character witness, the following exchange took place:

"*Q. [By the prosecutor]:* Now, give me an example of some of these conversations which you have heard these other people say, 'Yes, I believe Willie Bouchee.' "

\* \* \*

"*A.* Bouchee, Mr. Bouchee attends our church. We have dinners at our church. People who are connected with our church often says that Bouchee is a good man.

"*Q.* Say he is a good man?

"*A.* A good man.

"*Q.* All right. Do you ever remember them talking about—you say he is a good man. What does that mean?

"*A.* He is a law abiding citizen. It doesn't mean that he is a religious man. He is just like any other law abiding citizen.

"*Q. You wouldn't classify him as a religious man?*

"*A. Let me say a Christian. Let me rephrase it; not religious but let me say Christian.*

"*Q. Is that a person who believes and does not practice?*

"*A. Religion is a duty. A Christian is a person who believes in Christ. You don't have to believe in Christ in order to be religious.*"

The prosecutor argues that the statute and *Hall* are inapposite because the defendant first broached the subject of his religious practices by certain volunteered responses regarding his intention to tell the truth "so help me God", by his claimed church membership and attendance, and by asserting his strict belief in the Bible. The prosecutor urges us to affirm the Court of Appeals holding that "the defendant's initiative in putting his religious credentials before the jury invited clarifying inquiry by the people". To hold otherwise, the prosecutor contends, would allow the defendant to offer unimpeachable religious credentials with impunity, irrespective of their substance.

In *People v Hall, supra,* we held that a prosecutor's question to the defendant inquiring whether he believed in a Supreme Being, although it was merely an oblique reminder to the defendant that he was under oath, and despite no objection by defense counsel, violated Const 1963, art 1, § 18 and MCLA 600.1436; MSA 27A.1436 and amounted to reversible error. The constitutional provisions states:

"No person shall be rendered incompetent to be a witness on account of his opinions on matters of religious belief."

The statute provides:

"No person may be deemed incompetent as a witness in any court, matter or proceeding, on account of his opinions on the subject of religion. No witness may be questioned in relation to his opinions on religion, either before or after he is sworn."

The Court observed:

"This statute leaves little room for discussion by this Court as to whether or not this cross-examination was improper. It clearly was so. As Justice CHRISTIANCY, in *People v Jenness,* 5 Mich 305, 319 (1858), stated:

" 'Under this section, it was clearly incompetent to question the witness in this case, in reference to her belief in a God, unless it can be shown that belief or disbelief in a God has no reference to "opinions on the subject of religion." Belief is a stronger term than opinion, and necessarily includes the latter. Belief or opinion in reference to the existence or non-existence of a Supreme Being, is, we think, not only a belief or opinion "on the subject of religion," but on the most important of all subjects of religion, and that which controls and gives form to all other religious opinions. We think, therefore, *it was clearly the intention of the legislature to prevent the first step,* and every subsequent step, in all inquiries of this kind * * * .' (Emphasis added.)" 391 Mich at 181–182.

In the case at bar, near the conclusion of the prosecutor's cross-examination of the defendant, the trial court, after ruling on an objection, asked:

*"The Court:* * * * Well, you spoke of the Bible, didn't you?

*"The Witness:* Yes, sir.

*"The Court:* Accepting the Bible wouldn't stop you then from having relations though you were a married man with a single woman or married as far as that is concerned, is that right, that wouldn't stop you either?

*"The Witness:* No, I don't think so.

*"The Court:* If the occasion presented itself?

*"The Witness:* Well, no, I don't think it would.

*"The Court:* Okay."

It appears that the court's question was designed to elicit an admission from the defendant that his claimed belief in the Bible was at odds with his testimony that he was willing to have consensual

extramarital sexual relations with the complainant. The question, however, constituted an inquiry of the defendant whether his religious beliefs permitted or forbade such conduct. This type of inquiry concerning defendant's "opinions on religion" is forbidden by the statute.

We recognize that the defendant did indeed volunteer the testimony that he belonged to the Catholic Church, attended the Church of God in Christ and believed "strictly in the Bible", for the ostensible purpose of demonstrating that he was a religious, moral and God-fearing man, and thus was possessed of the qualities of character inconsistent with the criminal sexual conduct of which he was accused.

Assuming without conceding the relevance of such evidence as tending to prove that the defendant was possessed of the specific traits of good character relevant to rebut the charge, the evidence did not invite or justify the kind of "clarifying inquiry" made by the court.

The prosecutor was fully entitled to challenge the defendant's claim of good character, either upon cross-examination or through extrinsic evidence in rebuttal. Such challenge might have taken the form *inter alia* of evidence of prior convictions, testimony contradicting the claimed church membership and attendance, or reputation evidence tending to disprove the claim of religious, moral and God-fearing qualities, if indeed such evidence existed. It would not have been competent, however, for the prosecutor to inquire of the defendant concerning the nature, substance and content of his religious beliefs in order to show that such beliefs were inconsistent with the qualities of good character claimed. Nor was it competent for the court to conduct such an inquiry.

Aside from the debatable relevance of such an inquiry to rebut the claim of a moral, God-fearing and religious character, such questioning is expressly forbidden by the statute and our holding in *Hall, supra.*[4]

Equally offensive to the principle that a witness, particularly "an accused [,] is entitled to be tried and convicted without the question of his religious opinions ever being put in front of the judge or jury for their consideration",[5] was the following inquiry made of the defendant's character witness, Reverend Amos Williams, by the prosecuting attorney:

"*Q.* You wouldn't classify him as a religious man?

"*A.* Let me say a Christian. Let me rephrase it; not religious but let me say Christian.

"*Q.* Is that a person who believes and does not practice?

"*A.* Religion is a duty. A Christian is a person who

---

[4] We note that there was no objection to the trial court's inquiry of the defendant concerning his belief in the Bible. That issue was also decided in *Hall:*

"The state argues, and it was so held by the Court of Appeals, that since no objection to the question appears on the record, and since 'manifest injustice' was not shown, this type of error does not require reversal. We disagree. If we were, on a case by case basis, to evaluate the entire record to determine if prejudice or manifest injustice occurred therein because of this type of question, we would emasculate our statute and the legislative intent behind it. Our statute clearly states that an accused is entitled to be tried and convicted without the question of his religious opinions ever being put in front of the judge or jury for their consideration. Whether the defendant hesitates, or unhesitatingly responds negatively or positively, or if he should quite properly refuse to respond, he still cannot avoid the risk of stimulating an offensively prejudicial reaction in some quarter of the jury. This Court feels that it is inappropriate for it to take it upon itself to determine whether or not such prejudicial reaction did in fact occur, when our statute clearly attempts to foreclose such review by forbidding the asking of the prejudicial question itself. A defendant is entitled to a trial free of such improper questions. Once the question is asked, this is no longer possible. A new trial is mandated." 391 Mich at 182–183.

[5] *People v Hall, supra* at 182.

believes in Christ. You don't have to believe in Christ in order to be religious."

Although the statutory prohibition only precludes questioning a witness concerning his own religious beliefs, we have no hesitancy to extend the rationale and application of the rule to the instance in which a witness's religious opinions and beliefs are explored through the questioning of another witness.

At common law, religious credentials were offered on the issue of the competency of the witness.[6] Const 1963, art 1, § 18 explicitly rejects the common-law requirement that belief in a Supreme Being is a prerequisite to testifying.

Many of the other common-law disabilities such as infancy, infamy and interest in the outcome of the litigation no longer operate in the modern law of evidence to disqualify a witness from testifying.[7] However, these disabilities persist in the form of methods of impeachment.[8] MCLA 600.1436; MSA 27A.1436 expressly prohibits the use of religious beliefs even for impeachment by stating without qualification that "[n]o witness may be questioned in relation to his opinions on religion, either before or after he is sworn". We believe that the intention of the Legislature to prohibit this form of impeachment compels us to apply the proscription to intrinsic and extrinsic impeachment alike.

---

[6] A common-law requirement to take the oath was the belief in a Supreme Being who would punish false swearing. *Attorney General v Bradlaugh,* 14 QBD 667 (1885). *See also* 6 Wigmore, Evidence (Chadbourn rev), § 1817; McCormick, Evidence (2d ed), § 63.

[7] *E.g.,* MCLA 600.2158; MSA 27A.2158 (no disqualification of witness from testifying due to interest in the outcome, relationship of witness to party or conviction of a crime); MCLA 600.2163; MSA 27A.2163 (children may testify).

[8] *See* MCLA 600.2158; MSA 27A.2158; *People v Jackson,* 391 Mich 323; 217 NW2d 22 (1974); *Luck v United States,* 121 US App DC 151; 348 F2d 763 (1965).

Reverend Williams was called by counsel for the defendant as a character witness. The direct examination was carefully confined to an inquiry concerning the defendant's reputation in the community for veracity. Upon cross-examination, however, in an effort to explain and justify his claimed knowledge of the defendant's reputation for veracity, Reverend Williams stated, "People who are connected with our church often says that Bouchee is a good man." The expression "good man" which was employed by the witness in an effort to explain the basis for his testimony concerning Bouchee's reputation for veracity did not offer justification for the prosecuting attorney to conduct a general inquiry concerning the defendant's entire character and specifically did not warrant any "clarifying inquiry" concerning the defendant's religious beliefs and practices.

Both the inquiry by the court of the defendant and the inquiry by the prosecutor of Reverend Williams concerning the defendant's religious beliefs were prejudicially unfair and constitute grounds for reversal.

## III

The defendant also complains that it was unfairly prejudicial to allow the prosecutor to cross-examine him and his wife regarding the fact that their four children were all born prior to their marriage.

During his cross-examination of Mrs. Bouchee, the prosecutor was allowed to establish, over objection, that the youngest child of the defendant and his wife was nine years old, while they had been married only seven years. Later, while cross-examining the defendant, the prosecutor was allowed to

pursue the matter further, again over objection that the subject matter was irrelevant.

The Court of Appeals thought this "line of inquiry" was one this Court approved in *People v La Londe,* 197 Mich 76; 163 NW 490 (1917), "as affecting the credibility of the witness".

In *La Londe* the defendant was charged with statutory rape of a girl who allegedly became pregnant as a result of the incident. La Londe's defense was that at the time of the occurrence, and for several years before that, he was impotent by reason of an unfortunate kick from his horse. This Court ruled that the trial court did not abuse its discretion in allowing the prosecutor to ask the defendant if he was responsible for a child born to another woman employed in his office. *La Londe* is inapposite here.

It is elementary that any witness who testifies, including a defendant in a criminal case, "puts in issue" his credibility, or as it is sometimes called, his character for truthfulness. Jurisdictions are split on whether a witness's credibility may be impeached by a showing that he is possessed of a general bad character[9] or whether such impeaching character evidence must be limited to the particular character trait of veracity. McCormick, Evidence (2d ed), § 41; 81 Am Jur 2d, Witnesses, § 563. The modern tendency has been to limit the inquiry to character evidence bearing solely upon the witness's truthfulness. *E.g.,* FRE 608.[10]

In Michigan the state of the precedent is uneven, but apart from the "disciplined discretion of the bar to avoid abuses,"[11] it appears that the

---

[9] The impeaching character evidence to which we have reference here relates to specific conduct or specific "bad acts", as it is sometimes called, which have not resulted in conviction for crime.

[10] *See also* Proposed MRE 608.

[11] McCormick, Evidence (2d ed), § 42. *See also, People v Whalen,* 390

"extent to which a witness may be cross-examined on questions affecting his or her credibility rests in the sound discretion of the trial court * * * ". *People v Myers,* 239 Mich 105, 109; 214 NW 130 (1927). Although this Court has accepted the rule that "the previous life and character of a witness may be inquired into to elicit facts which may aid the jury in determining what credence they will attach to his testimony," *People v Gotshall,* 123 Mich 474, 483; 82 NW 274 (1900), we have also held that it is the trial court's duty to "keep such [character] examinations within reasonable bounds." *People v Gotshall; People v Hammond,* 394 Mich 627; 232 NW2d 174 (1975) (opinion by KAVANAGH, C. J.). In the past we have allowed prosecutorial forays into a witness's general character in order to challenge credibility, *People v Petty,* 234 Mich 282; 207 NW 920 (1926), *People v Cutler,* 197 Mich 6; 163 NW 493 (1917); however, we have also attempted to limit character impeachment to the particular character trait being attacked. *People v Johnson,* 393 Mich 488; 227 NW2d 523 (1975) (credibility); *People v Whalen,* 390 Mich 672; 213 NW2d 116 (1973)(bias); *People v Tolewitzke,* 332 Mich 455; 52 NW2d 184 (1952) (credibility); *People v Rice,* 136 Mich 619; 99 NW 860 (1904) (bias); *People v Gotshall, supra* (credibility); *Calkins v Ann Arbor R Co,* 119 Mich 312; 78 NW 129 (1899) (credibility); *People v Abbott,* 97 Mich 484; 56 NW 862 (1893) (credibility); *People v Cahoon,* 88 Mich 456; 50 NW 384 (1891) (credibility); *Rickabus v Gott,* 51 Mich 227; 16 NW 384 (1883). Indeed, we perceive that the latter course is the fairest and most effective way to "keep such [character] examinations within reasonable bounds".

---

Mich 672, 687; 213 NW2d 116 (1973), citing Code of Professional Responsibility, DR 7-106(C); McCormick, *supra,* §§ 41, 42; 3A Wigmore, Evidence (Chadbourn rev), § 983.

We hold, therefore, that character evidence offered to impeach or support a witness's credibility, other than evidence of prior conviction for crime,[12] must be limited to the particular character trait of truthfulness or untruthfulness.

The inquiry regarding the birth of the Bouchees' four children before their marriage was an attempt to show that Bouchee and his wife were either possessed of a bad general character or, more narrowly, a bad character for truthfulness by showing them to be guilty of specific acts of misconduct not resulting in conviction.

For the reasons indicated above, the evidence was inadmissible because it was not competent to impeach the witnesses' credibility by showing them to be possessed of a bad general character. We cannot agree with the apparent assumption of the trial court, and the express holding of the Court of Appeals, that the legitimacy of the Bouchees' four children related to the truthfulness or untruthfulness of the defendant or his wife as witnesses. In light of the unfairly prejudicial nature of the testimony, we hold that its admission on the issue of the credibility of the defendant or his wife amounted to an abuse of discretion.

IV

Defendant also contends that portions of the prosecution's closing argument expressed the prosecutor's personal opinion as to the credibility of the witness and the defendant's guilt.

We are not persuaded that the argument was

_____

[12] The use of prior convictions to impeach a witness's credibility is governed by *People v Jackson,* 391 Mich 323; 217 NW2d 22 (1974), and related cases. In *Jackson* we adopted the *"Luck-Gordon"* approach for this method of impeachment. *Luck v United States,* 121 US App DC 151; 348 F2d 763 (1965); *Gordon v United States,* 127 US App DC 343; 383 F2d 936 (1967).

improper. In any event, because no objection was made at trial, appellate review is foreclosed unless our failure to consider the issue would result in a miscarriage of justice. *People v Hall,* 396 Mich 650; 242 NW2d 377 (1976); *People v Robinson,* 386 Mich 551; 194 NW2d 709 (1972).

However, because we find prejudicial error resulting from portions of the cross-examination of the defendant and his witnesses, we reverse and remand for a new trial.

KAVANAGH, C. J., and WILLIAMS and LEVIN, JJ., concurred with RYAN, J.

COLEMAN, J. *(concurring).* I concur in the result because it was error to permit the prosecutor to cross-examine defendant over objection concerning the legitimacy of the defendant's children. This was prejudicial information which had, at most, a remote relationship to the charge and to defendant's credibility.

FITZGERALD, J., concurred with COLEMAN, J.

BLAIR MOODY, JR., J., took no part in the decision of this case.